Douglas (Trey) Lynn, SBN 028054
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 East Camelback Road, Suite 800
Phoenix, AZ 85016
Telephone:   602.778.3700
Facsimile:    602.778.3750
trey.lynn@ogletree.com

*Attorneys for Defendant*
*American Airlines, Inc.*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Daryl Mack,<br><br>          Plaintiff,<br><br>     v.<br><br>American Airlines, Inc.,<br><br>          Defendant. | No.  2:21-cv-00558-DJH<br><br><br>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Fed. R. Civ. P. 56, Defendant American Airlines, Inc. ("American") moves for summary judgment and requests that judgment be entered in its favor on all of Plaintiff Daryl Mack's claims. This motion is supported by the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

Mack's documented performance failures and customer complaints with American were legion. Mack repeatedly failed to follow American's procedures for handling lost and damaged luggage and for providing customer service. Despite being provided with ample and documented opportunities to improve his performance, Mack failed to improve his performance to a satisfactory level. Mack's discharge in September 2019 was a direct result of his well-documented performance failures and was not related to his race (Black) or any protected activity. Mack presents no evidence that he was unlawfully discriminated or retaliated against by his former managers at American.

//

I.      **FACTUAL BACKGROUND**

American is one of the largest passenger airline companies in the world. American has implemented and enforces multiple policies to ensure that its workplace is free of any type of discrimination, harassment, or retaliation. Ex. 1. American expressly prohibits and takes proactive steps to prevent discrimination in employment on the basis of physical disability, mental disability, medical condition, race, color, religion or religious creed, gender/sex, marital status, gender identity, gender expression, sexual orientation, national origin, ancestry, ethnic origin, citizenship, age, military and protected veteran status, genetic information, pregnancy, or any other basis protected by law. American also provides numerous avenues through which employees can report discrimination, harassment, or retaliation and expressly prohibits any retaliation against employees who make complaints of discrimination or harassment or participate in an investigation of such complaints. *Id.*

Mack last worked for American as a Central Baggage Resolution Specialist ("Specialist") in its Central Baggage Resolution Office ("CBRO") from March 2016 to September 2019, handling claims by American passengers relating to their lost and/or damaged bags. Doc. 1 at ¶¶ 8, 27; Ex. 2, 16:4-8, 18:5-14, 40:3-15; Ex. 3. His job duties included, among other things, reaching out to customers to obtain descriptions of the bags and their contents, approving payments for damaged bags/items, and locating lost bags using American's software (known as NetTracer and WorldTracer). Ex. 2, 18:5-14, 21:20-23:11, 24:1-25:10; Ex. 3; Ex. 4. Specialist job performance was measured based on objective and subjective factors, including number of claims resolved, Quality Monitor ("QM") scores, phone compliance, quality of calls, and customer feedback. Ex. 5, American63.

A.      **Mack Performs Poorly On Katherine Howard's Team And Is Counseled About His Performance.**

In March 2016, Mack transitioned to the Specialist role but consistently failed to perform his job duties at a satisfactory level. On March 11, 2016, CBRO manager Christina

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602.778.3700

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
Esplanade Center III, Suite 800
2415 East Camelback Road
Phoenix, AZ 85016
Telephone: 602.778.3700

Jenkins (Black) counseled Mack regarding his handling of a case. Ex. 8, American99. Between March and August 2016, Mack's manager – Kathy Howard (White) – counseled him multiple times about his poor case handling. *Id.*, American100-109. Mack was easily confused by the claim process and failed to properly document files or follow up with customers. She asked other Specialists to sit with Mack to walk him through processes. *Id*.

In August 2016, Howard learned Mack had not taken any action on a customer's complaint from May about her lost iPad. *Id.*, American110-113. Mack received the customer's email, acknowledged it, and incorrectly labeled it a duplicate – resulting in no action being taken on the claim. The customer was an executive of another airline who knew an American executive, and resulted in an embarrassing escalation of what should have been a minor baggage issue to one of American's senior vice presidents. *Id*. Howard placed Mack on a performance improvement plan ("PIP") on August 25, 2016. Ex. 9; Ex. 8, American115. As part of Mack's PIP, he met with Howard every two weeks to review his progress and discuss his performance to help him succeed.

Mack's performance was inconsistent for the rest of 2016 and 2017. On one review, Mack only received 10 out of a possible 115 points due to numerous mistakes he made in his handling and documentation of a claim. Ex. 10. Howard counseled him numerous times on his performance. Ex. 8, American117-124.

**B.**      **Mack Performs Poorly On Sally Zane's Team And Is Counseled About His Performance.**

After Mack was counseled about his performance by Howard, he bid for a new shift and was assigned to CSM Sally Zane's (White) team. She addressed many of the same performance issues that Howard had raised, such as improper and insufficient notation on claims, not following up on claims, not following standard procedures for handling claims, and failing to complete required proactive calls. *Id.*, American125-130. Also, Mack had not been using Sabre and QIK – two programs he should have been using for months. *Id.*, American128. On August 1, 2017, Zane compiled a list of 18 cases Mack had mishandled

in various ways, including closing and reopening the same cases, and informed him that his performance was unacceptable and needed to improve immediately.[1] *Id.*, American130.

On September 14, 2017, Zane counseled Mack for failing to properly trace[2] for a bag, resulting in it being salvaged before it could be located. *Id.*, American131. Zane then sat with Mack to observe how he traced for bags. She noted that Mack appeared very unfamiliar with the process and did not even know where to go to log into the tracing software. *Id.*

## C.   Mack Performs Poorly On Evelyn Baca's Team And Is Counseled About His Performance.

After being counseled by Zane for poor performance, Mack again bid for a different shift and was assigned to manager Evelyn Baca's (Hispanic) team. Ex. 11 ¶ 4. In November 2017, Baca counseled Mack about remaining at his desk during his scheduled phone time. Ex. 8, American133-34; Ex. 12, American190. Mack admitted he left his desk for personal phone calls and Baca advised him that he was to remain at his desk during his phone shift, per CBRO policy. *Id.*; Ex. 5, American58. Baca followed up with Mack again on the same issue on January 4, 2018. *Id.* Baca also received complaints about Mack not following up on cases from other Specialists in January 2018. Ex. 8, American137-138; Ex. 11 ¶ 6.

On January 4, 2018, Baca counseled Mack for walking away from his desk during his assigned phone blocks to make personal calls, resulting in abandoned customer calls.[3] Ex. 11 ¶ 14. Mack acknowledged the concerns and stated he would work to improve. *Id.* However, Baca received multiple complaints from customers that Mack was not returning calls or contacting them on their cases, and from other Specialists that he was not following

---

[1] Mack is listed as "Daryl Mason" on his cases to protect his identity when dealing with customers.

[2] Tracing is the process to search for and locate lost bags. After a certain period of time, if lost bags are not claimed, they are salvaged – meaning they are thrown away or destroyed. If a customer's bag is salvaged, American is responsible for paying the customer for the value of its bag and its contents.

[3] Mack concedes he would leave his desk to make personal phone calls, and claims Ferrell admonished him for doing so and instructed him to wait for breaks to make personal calls. Ex. 2, 96:21-97:13; 98:24-99:24. CBRO policy explicitly prohibited use of cell phones for personal calls while not on break. Ex. 5, American58.

4

up with customers. *Id.* ¶ 15. She then reviewed Mack's cases and discovered he was not tracing for lost bags and was not following CBRO Standards of Work Processes. *Id.* ¶ 16. Baca also saw Mack sleeping at his desk during work hours. *Id.* ¶ 17. Baca emailed Mack on February 10, 2018 outlining the issues with the cases he was handling (with 12 examples), including mislabeling cases, failing to enter information into the system, and failing to look for missing bags, resulting in bags being salvaged when they could have been returned to customers. Ex. 13.

Mack's performance did not improve and Baca issued Mack a PIP on March 30, 2018.[4] Mack refused to accept responsibility for his performance failures, but conceded he had not spent any time studying the tracing manual he had been provided and could not say why he had not asked for help prior to the meeting. *Id*. Mack did not have an explanation for his failures to follow up with customers or the other errors that were unrelated to tracing. Ex. 11 ¶ 22. Per Mack's request, Baca assigned several specialists to sit with Mack and walk him through the tracing process. *Id.* ¶ 23. During the meeting, Mack never stated that he believed he had been discriminated against because of his race. *Id.* ¶ 21.

Baca observed errors in Mack's case handling over the next month and issued another PIP on May 5, 2018. Ex. 11 ¶ 25; Ex. 8, American142, 143-147; Ex. 14. Notably, this second PIP outlined the numerous ways American had tried to help Mr. Mack, including daily and monthly team meetings, tracing training, and providing additional on-demand training materials that he could view at his convenience. Shortly after Baca placed Mack on the second PIP, he bid for a different schedule and, as a result, was transferred to a different team under Kelli White (White). Ex. 11 ¶ 26.

**D.    Mack Fails Tracer Training And Complains About the Trainers.**

Mack underwent tracing training in December 2017 and January 2018 to help him become more familiar with the tracing process. Ex. 11 ¶ 5; Ex. 2, 58:7-11. Mack failed the tracing training, but was allowed to go through training a second time. Ex. 11 ¶ 5. In January 2018, members of the training team reached out to Baca with concerns about

---

[4] Team Lead Jemal Ferrell (Black) was present at the meeting. Ex. 11 ¶ 18.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602.778.3700

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602.778.3700

Mack's performance in training. They stated that Mack was on his phone during instruction, walked out of class to make calls, returned late from lunch, was not engaged in the training, and failed assessments. *Id.* ¶ 6. Baca met with Mack to discuss the training, but Mack denied being on his phone or walking out of training to make calls. He claimed he was failing assessments because he believed the trainers were "mean" to him and that Christina Jenkins (Black) was distracting him. Baca asked Mack to document his side of the story. *Id.* ¶ 7.

On February 2, 2018, Mack emailed Baca a document outlining events he claimed occurred during training (the "Complaint").[5] *Id.* ¶ 8. Mack included an instant messenger conversation he had with Jenkins, in which she asks whether he spoke with a member of leadership because he did not meet the required 90% on the assessment to continue training. *Id.* ¶ 9 Mack claimed that this message was a distraction to him during training. *Id.* Mack also claimed that the attitudes of the trainers toward him changed for the worse after he saw Jenkins talking to them. Ex. 2, 63:8-64:10, 65:16-66:22. While Mack now vaguely claims in this lawsuit that he mentioned race discrimination in his complaint to Baca, there is nothing in the written Complaint that mentions race, Mack admits the trainers made no comments about his race, and Baca states that Mack never complained about race discrimination. Ex. 2, 76:6-77:13; Ex. 11 ¶ 11. Moreover, Baca had no reason to believe that Mack's Complaint was related to his race because Jenkins – one of the primary individuals he complained about – is also Black. *Id.* If Mack had complained to Baca about race discrimination, she would have immediately investigated the allegations and escalated the issue to Human Resources per American's anti-discrimination policies. *Id.* ¶ 12. In his

---

[5] At the time, Mack was aware of how to submit a complaint to American's Human Resources Department. In November 2015, while Mack was working as a User Acceptance Tester for System Support, he filed a complaint with American's HR department. Ex. 6. Mack complained of "unfair treatment at work," but did not allege he was treated unfairly because of any protected characteristic, including race. *Id.* Mack testified he was upset about being assigned to work in a room that was too cold. Ex. 2, 31:7-34:11. After receiving Mack's complaint, American's HR department conducted an investigation and was unable to substantiate any of his complaints. Ex. 7.

deposition, Mack could not remember what it was he said about race discrimination to Baca. Ex. 2, 76:6-16; 77:21-25.

Baca understood Mack's Complaint to be that he did not believe the trainers were helpful or effective. However, at that time, Mack had been allowed to take the training twice and had completed the training. He was not required to have any further interaction with the trainers. As a result, Baca determined that the matter was resolved and did not believe involvement from Human Resources was necessary. Ex. 11 ¶ 13.

**E.    Mack Performs Poorly On Kelli White's Team And Is Counseled About His Performance.**

While on White's team, Mack continued to perform poorly. On June 27, 2018, he received 60 out of 100 points on a QM for failing to complete necessary tracing, among other things. Ex. 15. White discussed Mack's poor performance with him on July 12, 2018 and informed him that he would remain on the PIP for another 30 days. Ex. 8, American148. White assigned another Specialist to sit with Mack to go over tracing, but his performance issues continued. *Id.*, American149. White issued a Performance Counseling Letter ("PCL") to Mack on August 14, 2018, noting that Mack was failing to meet performance expectations and was not following proper policies and procedures regarding case handling. Ex. 16; Ex. 8, American152. White continued to meet with Mack to assist him with his performance throughout the rest of 2018. *Id.*, American155-158. Despite receiving support from White, Mack continued to perform poorly. He received another poor score of 31 out of 64 points on a QM on March 25, 2019 largely because he failed to properly follow up with the customer. Ex. 17.

**F.    Mack Performs Poorly On Cesar Romero's Team And Is Discharged.**

Mack bid for a new shift and was assigned to manager Cesar Romero's team in March 2019. Ex. 2, 126:16-21. At the time, Romero did not know anything about Mack's prior performance and did not look back at any of Mack's prior discipline or talk to Mack's prior supervisors about his performance. Further, Romero was unaware of Mack's Complaint. Ex. 18, 38:22-39:4; 67:5-21. Shortly thereafter, Romero's Lead Specialist,

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602.778.3700

Cassandra Tyler, met with Mack to go over his recent customer claims because many claims had been mishandled. Ex. 8, American161-162.

Romero also received complaints about Mack's performance from customers and other Specialists. Ex. 18, 68:4-70:5. Romero met with Mack on March 21, 2019 to discuss his performance and noted that Mack had mislabeled one claim and paid a customer for a claim without a receipt. Ex. 8, American163-164. Romero also addressed mishandled claims on March 27, 2019. *Id.*, American165.

Romero tasked Tyler with researching Mack's recently closed cases to determine whether they had been handled correctly when he received additional complaints, which was a procedure he had followed with other employees. Ex. 18, 68:4-70:5; 70:19-71:6; 72:1-4. On April 25, 2019, Tyler emailed identified nine cases that had not been handled correctly. Ex. 8, American167-170. In her findings, she noted Mack failed to trace for lost bags or follow up with customers. She noted that on a loss file Mack failed to follow up with the customer or do tracing for about two months, resulting in the bag being salvaged when it could have been located and returned to the customer. *Id*. Romero counseled Mack on some of his mishandled claims on May 3, 2019. *Id*.

On May 6, 2019, Romero advised Mack that he would need to be placed on a PIP to ensure he was tracing properly. *Id.*, American171-172. Romero issued a PIP to Mack on May 20, 2019, which stated Mack had issues with Stage 1-2-3 tracing and the Echo process – the same issues that had been raised with Mack by his prior supervisors. Ex. 19. Tyler continued to meet with Mack to coach him on his performance to help him improve. Ex. 8, American174-181, 184-185.

However, Romero continued to receive customer complaints. One complaint was from a "very dissatisfied" customer who was "deeply disappointed" with Mack's customer service and handling of her claim, which she described as "abysmal." Ex. 20. The customer complained that Mack had not contacted her until nearly two months after she first submitted her baggage claim, and when he finally did so, he gave conflicting information, disregarded her concerns, refused to allow her to speak to a supervisor, and told her there

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602.778.3700

was "nothing he could do for her." *Id.* Two weeks later, a second customer complained about Mack and stated that instead of helping her, he "tried to pass the buck all the time" and "did not [seem] willing to understand or help [her]" with her baggage claim, and instead ultimately closed her claim without taking any action. Ex. 21. Mack was counseled on these incidents. Ex. 8, American182-183.

As a result of these customer complaints and Mack's continued failure to correct his performance deficiencies, Romero issued two Final Warnings to Mack. Ex. 22.[6] Romero informed Mack that American was "losing faith in [his] ability to make sound decisions in [his] daily responsibilities" and again noted ongoing issues with communication and his lack of adherence to policy and procedure. *Id.* When Romero continued to note mistakes in Mack's claims after issuing the Final Warnings, Romero terminated Mack's employment on September 10, 2019. Ex. 23. Romero's decision to terminate Mack was reviewed and approved by HR Business Partner Freya Chavis-Hale (Black) and Senior Manager Katherine Nickel (White). Ex. 24, 64:15-65:4; Ex. 25 ¶ 11; Ex. 26 ¶ 10. Romero and fellow CSM Erick Stone[7] (Black) met with Mack on September 10, 2019 and informed him of his termination. Ex. 23; Ex. 27-K, DMACK183. Romero did not consider Mack's protected characteristics in his decision to terminate Mack's employment. Ex. 25 ¶ 10. And, Romero was not aware of the Complaint. *Id.* ¶ 6.

## II.    LEGAL STANDARD

Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Sheehan v. City of S.F.*, 743 F.3d 1211, 1220 (9th Cir. 2014). In responding to a motion for summary judgment, a plaintiff must do more than simply show that there is some metaphysical doubt as to the materials facts. The

---

[6] Mack's first Final Warning is dated July 10, 2019. Although Romero could have proceeded to terminate Mack's employment when his performance continued to be deficient after receiving his first Final Warning, he wanted to give Mack another chance and thus issued him a second Final Warning on August 22, 2019.

[7] Stone concurred with the termination decision. Ex. 25 ¶ 12.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602.778.3700

1    plaintiff must set forth specific facts showing there is sufficient evidence to allow a jury to

2    return a verdict in the plaintiff's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256

3    (1986); *Johnson v. City of Seattle*, 474 F.3d 634, 638 (9th Cir. 2007).

4    **III.    ANALYSIS**

5        **A.    Mack's Discrimination Claim Fails As a Matter of Law.**

6        Mack alleges American discriminated against him because of his race in violation

7    of Title VII and 42 U.S.C. § 1981.[8] Mack offers no direct evidence of discrimination. *Young*

8    *v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1354 (2015); *Coghlan v. Am. Seafoods Co.*,

9    413 F.3d 1090, 1095 (9th Cir. 2005). To the contrary, he concedes no one at American

10   made any comments about his race. Ex. 2, 229:3-9. Additionally, multiple other individuals

11   who were involved with complaints about Mack's performance and Mack's discipline,

12   including Christina Jenkins, Jemal Ferrell, Freya Chavis-Hale, and Erick Stone, are also

13   Black, undermining Mack's claim for race discrimination. *See Gray v. Motorola, Inc.*, No.

14   CV07-1466-PHX-MHM, 2009 WL 3173987, at *11 (D. Ariz. Sept. 30, 2009), *aff'd*, 407

15   F. App'x 103 (9th Cir. 2010) (an inference of discrimination is undermined when relevant

16   decision-makers are members of the same protected class as the plaintiff).

17       Because there is no direct evidence of discrimination, Mack must establish a *prima*

18   *facie* case of race discrimination by proving that: (1) he belongs to a protected class; (2) he

19   performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) he

20   was treated differently than similarly situated employees outside of his protected class.

21   *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006). If Mack

22   establishes a *prima facie* case of race discrimination, the burden shifts to American to

23   articulate a legitimate, nondiscriminatory reason for its action. *McDonnell Douglas Corp.*

24   *v. Green*, 411 U.S. 792, 802 (1973). Once American articulates its legitimate,

25   nondiscriminatory reasoning, Mack has the ultimate burden to prove by a preponderance

26

27

28   [8] Race discrimination and retaliation claims under Title VII and § 1981 are analyzed the
     same. *White v. AKDHC, LLC*, 664 F. Supp. 2d 1054, 1067 (D. Ariz. 2009).

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602.778.3700

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602.778.3700

of the evidence that American's reason for the adverse employment action was merely pretext for illegal discrimination. *Id.*; *Diaz v. Eagle*, 521 F.3d 1201, 1207 (9th Cir. 2008).

### 1.   Mack was not performing his job satisfactorily.

Mack cannot establish a *prima facie* case of race discrimination because he did not perform his job satisfactorily, as evidenced by his numerous documented counselings, four PIPs, failing QM scores, numerous customer complaints, one PCL, and two Final Warnings. One of a Specialist's core job functions is to provide top-notch customer service to passengers; indeed, that is precisely why the job exists. Ex. 2, 105:5-19; *See, e.g.*, *Rice v. Wynne*, 2006 WL 8447930, at *1 (C.D. Cal. Aug. 7, 2006) (noting that providing excellent customer service can be a core job function). Despite giving Mack every opportunity to succeed, five different supervisors all noted the same performance issues – namely, poor customer service, lack of communication with customers regarding their baggage claims, and inability to follow American's procedures for tracing and documenting baggage claims. Of particular concern was that Mack was failing to trace for bags or follow up with customers in a timely manner, resulting in bags that could have been located being salvaged. *Id.*, 128:22-129:12. When this occurred, American was required to pay customers for the bags and their contents, resulting in unnecessary cost to the company. *Id.*, 131:13-132:9.

Mack's voluminous, documented performance failures prove that he was not performing his job satisfactorily and is unable to state a *prima facie* discrimination claim. *See, e.g., Mitchell v. Am. Airlines, Inc.*, No. CV17-2470-PHX DGC, 2018 WL 4931718, at *4 (D. Ariz. Oct. 11, 2018) (granting summary judgment in American's favor where former employee had a lengthy record of complaints from passengers and employees). Mack's only evidence that he performed well is his own self-serving opinion, which cannot create a genuine dispute of material fact. *Weil v. Citizens Telecom Servs. Co.*, 922 F.3d 993, 1003 (9th Cir. 2019).[9]

---

[9] Even Mack concedes he did make mistakes in his position and was made aware of those. Ex. 2, 176:5-8; 188:1-16.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602.778.3700

**2.**     **Mack was not treated differently than similarly situated White or Hispanic Specialists.**

Mack must present evidence that similarly-situated White and Hispanic employees were treated more favorably than him.  He has presented no such evidence. To the contrary, the documentary evidence proves Mack was given far more chances to improve his performance than any other employees. Of the 34 Specialists who were terminated around the time Mack was terminated, 22 (65%) were White or Hispanic. Ex. 28, American1051. As described below, many were terminated for the same performance failures as Mack and Mack was given even more chances to improve his performance.

Romero gave SA[10] (Hispanic) a verbal warning for attendance on November 24, 2018. *Id.*, American1156. Romero issued a PIP to SA on April 3, 2019 due to issues with case handling and issued a PCL on July 3, 2019 for attendance. *Id.*, American1162, 1171. Romero issued a Final Warning on January 14, 2020 for failing to adhere to policies, including the Echo process and updating cases. *Id.*, American1181. Romero terminated SA on or around March 19, 2020 for unsatisfactory performance. *Id.*, American1051, 1183; Ex. 31, 51:1-7.

In April 2019, Romero counseled LH (Hispanic) about her performance, including tracing for bags and missing points on QMs. Ex. 28, American1227. In July 2019, Romero noted that LH missed key points on her QMs. Ex. 28, American1229. Similarly, in October 2019, LH was struggling to resolve loss claims on her own. *Id.*, American1231. Romero issued a PIP to LH on November 14, 2019, noting that case handling required immediate correction. *Id.*, American1238-39. Romero issued a Final Warning to LH on February 20, 2020. *Id.*, American1240-41. When LH's performance did not improve after one month, Romero terminated her employment. *Id.*, American1242.

VM (White) was terminated on May 16, 2019 for attendance and performance issues. Ex. 31, 52:4-21, 56:9-16; Ex. 28, American1051. VM was placed on a PIP on March

---

[10] Initials are used to protect the privacy interests of non-party employees and former employees.

22, 2018 for "quality concerns" because, like Mack, she failed to include relevant documentation in resolved cases and follow the Echo process. Ex. 28, American1469. On April 2, 2019, Laura Harris (training manager) admonished VM for sleeping in training and showing up late. *Id.*, American1470-71; Ex. 18, 45:1-4. VM was issued a PCL on April 24, 2019 and Harris issued a Final Warning when VM was 5 minutes late returning from lunch.[11] Ex. 28, American1474-76. Harris terminated VM on May 16, 2019 for poor performance and attendance during training. *Id.*, American1477-79.

YR received a PCL on December 13, 2018 for attendance. *Id.*, American1490-91. YR was also counseled for performance on February 2, 2019 for not documenting her notes, not checking receipts, and for high average payouts. *Id.*, American1493-94. On March 22, 2019, YR was counseled about her QM scores and about needing to follow the Echo process with every case and failing to properly document cases. *Id.*, American1497-98. YR was counseled on June 6, 2019 about poor QM scores. *Id.*, American1501. YR received final warning on December 2, 2019 regarding attendance. *Id.*, American1506-07. YR was counseled in January 2020 and several areas of needed improvement were identified to ensure she was following proper policies and procedures. *Id.*, American1511. CSM Stone terminated YR on March 9, 2020 for unsatisfactory performance and attendance. *Id.*, American1516. Prior to termination, YR received one PCL, three verbal counselings, and one final warning.

AS (Asian) was counseled about her case handling on July 5, 2018. *Id.*, American1521. AS failed to follow through with customers, failed to send case letters, and did not follow Echo timelines. *Id.* AS was terminated on August 8, 2018 for the performance failures. *Id.*, American1051. Laura Harris also counseled SS (White) about professionalism in training. *Id.*, American1525. Harris issued SS a PCL on May 9, 2019 for poor performance regarding case handling. *Id.*, American1527-28. CSM Stone issued SS a Final Warning on June 25, 2019 for failing to resolve customer claims unassisted. *Id.*,

---

[11] In his Complaint, Mack claimed other employees were treated more favorably than him when they returned late from lunch. This is clearly untrue.

American1530. Stone, along with Romero, met to terminate SS on October 11, 2019 due to the quality of her work. *Id.*, American1532-33.

The evidence shows that, contrary to his allegations, Mack was terminated for the same types of performance failures as White and Hispanic employees and was even given more chances to improve his performance than other employees.

### 3. American had a legitimate, non-discriminatory reason for Mack's termination.

Even if Mack could demonstrate a *prima facie* claim for discrimination (which he cannot), summary judgment is still appropriate because American had a legitimate, clear, specific, and non-discriminatory reason for the termination. *Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011). A common legitimate, non-discriminatory reason is unsatisfactory work performance. *Dark v. Curry Cty.*, 451 F.3d 1078, 1083 (9th Cir. 2006). Unsatisfactory work performance can be shown by unsatisfactory performance evaluations or warnings for violation of company policy without performance improvements. *Diaz v. Eagle*, 521 F.3d 1201, 1208 (9th Cir. 2008). American terminated Mack for his continued, documented performance failures. Ex. 23; Ex. 18, 122:18-123:15. There is ample evidence that Mack was not performing his job satisfactorily. The only reason Mack was not discharged sooner is because he would bid for different shifts any time he believed his job was in danger, resulting in assignments to new supervisors. This allowed Mack to continue his employment far longer than other Specialists with similar performance issues.

### 4. There is no evidence American's proffered rationale was pretextual.

Finally, Mack cannot show that American's reasons for the adverse employment action were merely pretext for illegal discrimination. Pretext can be shown either directly by demonstrating that a discriminatory or retaliatory reason more than likely motivated the employer or indirectly by demonstrating that the proffered reason for the employment decision is not worthy of belief. *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998). A plaintiff's

14

mere second-guessing of the defendant's reasoning for an adverse employment action or evidence suggesting that the defendant made an erroneous business decision fails to show pretext because a court should not sit as a super-personnel department that reviews an employer's business decisions. *Western Air Lines, Inc. v. Criswell*, 472 U.S. 400, 423 (1985); *Killingsworth v. State Farm Mut*, 254 F. App'x 634, 637 (9th Cir. 2007). Pretext does not exist merely because the adverse employment action was unwise, unfair, or incorrect. *Dept. of Fair Emp't v. Lucent Tech*, 642 F.3d 728, 746 (9th Cir. 2011). Evidence of pretext must be specific and substantial. *Gage v. Midwestern Univ.*, No. CV-19-02745-PHX-DLR, 2022 WL 159183, at *7 (D. Ariz. Jan. 18, 2022) (citations omitted).

Mack may argue that there is evidence of pretext because his Pay for Performance (PFP) ranking around the time of his termination was a below-average 81 out of 142 CBRO Specialists. Ex. 29. However, this one, particular PFP ranking is not sufficient evidence of pretext to overcome summary judgment. The PFP ranking system was first implemented in 2019. Ex. 30, 20:22-21:10. Vince Martyn, the individual responsible for developing the program, testified that the PFP ranking was never intended to be the sole measure of performance and should not be used as such. *Id.*, 56:25-58:23. Overall Specialist performance was measured based on numerous factors, including number of claims resolved, Quality Monitor ("QM") scores, phone compliance, quality of calls, and customer feedback. Ex. 5, American63.

Additionally, the PFP ranking had many flaws, and could be manipulated by Specialists. For example, the system gave Specialists credit for closing two cases when the same case was closed, reopened, and then closed again. Ex. 18, 34:19-35:8; Ex. 30, 69:5-14. Those numbers did not take into account whether the case had been closed properly. *Id*. Also, Specialists could place customers on a "long hold," which involved placing the customer on hold and then just walking away. Ex. 30, 78:1-79:16. For purposes of the ranking, the Specialist would get credit for being on the phone the entire time of the hold. *Id*. Mack engaged in both of these behaviors and was counseled for them. Ex. 8, American130 (eight instances of closing and reopening the same cases); Ex. 12,

American190 (counseled for placing customers on long holds). Martyn also testified that Mack's name showed up on integrity reports, which tracked behaviors that artificially inflated PFP numbers and rankings. Ex. 30, 76:21-78:4. Due to the flaws in the PFP ranking system, it was changed substantially in subsequent years, to the point that the ranking system is no longer used for CBRO Specialists. Ex. 18, 32:21-33:15. In sum, Mack cannot create a question of fact on pretext by citing one PFP Ranking. Mack's poor performance was already negatively judged and well-documented based on other factors and reports. It is unreasonable to conclude that this singular, limited, and unreliable report somehow erased numerous instances of Mack's performance deficiencies. Furthermore, the PFP Ranking, viewed on its own, does not create any reasonable inference that Mack's race was the true basis for his discharge.

**B.    Mack's Retaliation Claim Fails As a Matter of Law.**

American did not unlawfully retaliate against Mack. To establish a presumption of retaliation Mack must present evidence showing: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). An employee must present sufficient evidence of retaliation, directly or indirectly, to establish a causal link between discriminatory animus in the workplace and the challenged employment decision. *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 283 (2009). Mack's retaliation claim must be proved "according to traditional principles of but-for causation . . ." *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

**1.    Mack did not engage in protected activity.**

Mack's Complaint does not rise to the level of protected activity under Title VII or § 1981. Nowhere did Mack write anything about race, nor can one infer from his text that he felt discriminated against based on his race. Mack's attempts in his deposition testimony to add a racial element to the Complaint are woefully insufficient to overcome summary judgment. Mack initially testified that he could not even recall whether he actually raised

16

the issue of race with Baca.[12] Ex. 2, 76:6-77:25. Mack conceded that none of the individuals mentioned in the Complaint made any comments about race, and he only speculated at his deposition that race was a factor in his treatment because he was the only person of color in the training. Ex. 2, 76:7-19; 76:20-77:13. Mack also testified that he told Nickel about his Complaint in May 2018, but did not tell her about anything beyond what was in the written Complaint, which he provided to her. Ex. 2, 107:23-108:10; Ex. 26 ¶¶ 3-7. He later changed his testimony and stated he did complain about race discrimination to Nickel, but could not recall what he said in that regard. Ex. 2, 108:11-109:14.

Mack also alleges that he made some vague reference to race in a meeting with Managing Director Jim Fahnestock sometime in 2019, but could not recall what he said. *Id.*, 204:10-205:23. In the recorded conversation with Fahnestock on August 23, 2019, Mack makes no mention of race. Ex. 27-J, DMACK181. Rather, the conversation was limited to Mack's various continuing performance issues. Fahnestock even suggested that the CSMs had been more liberal with Mack, implying Mack should have been terminated sooner than he was. *Id.*, 5:19-24. From the written documents, it is clear that Mack never complained of race discrimination, but rather made general complaints about his perceived treatment by the training team and Jenkins (who is also Black). His retaliation claims fail as a result. *Skinner v. Arizona Public Service Company*, No. CV06-2577-PHX-JAT, at *9 (D. Ariz. Mar. 30, 2009) ("General complaints that do not indicate a connection to a protected class or that fail to provide facts sufficient to create such an inference do not constitute a protected activity under Title VII.") Even accepting Mack's constantly changing testimony as true, he only made vague references to race that were not based on any comments or conduct he can identify. Thus, he did not have a reasonable belief that he was being discriminated against because of his race. *Theriault v. Dollar Gen.*, 336 F. App'x 172, 174–75 (3d Cir. 2009) (plaintiff did not engage in protected activity because she

---

[12] After a break in the deposition during which he conferred with his counsel, Mack claimed that he thought he had mentioned race to Baca, but could not recall what he said to her. Ex. 2, 110:9-17.

complained only of a single incident that no reasonable person could have believed violated Title VII). Due to the vague allegations, none of the individuals involved in Mack's discipline and termination had reason to believe Mack was complaining of race discrimination and his complaints do not rise to the level of protected activity under Title VII or § 1981.

### 2. Romero did not know about the alleged protected activity when he decided to terminate Mack's employment.

Even if the February 2018 or the Fahnestock 2019 Complaints rose to the level of protected activity (and they do not), Mack's retaliation claims fail because Romero – the person responsible for his termination – did not know of any race complaints by Mack when he decided to terminate Mack. Ex. 25 ¶ 8. "In general, if the decision maker does not have knowledge of the plaintiff's protected activity, there can be no retaliation for engaging in that activity." *Brooks v. Capistrano Unified Sch. Dist.*, 1 F. Supp. 3d 1029, 1037–38 (C.D. Cal. 2014)(citations omitted); *Thomas v. City of Beaverton*, 379 F.3d 802, 812 n. 4 (9th Cir.2004); *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir.2003) ( "[T]he plaintiff must make some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity."); *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir.1982) ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.").

Mack concedes he never told Romero about the Complaint or what it involved. Ex. 2, 214:19-215:24. He only speculates that Romero knew about the Complaint because he was "close with" Baca. *Id.*, 215:25-217:22. However, Mack's speculation is insufficient to create a fact question when Romero has sworn under oath that he did not know about the Complaint at the time of Mack's termination. *See Wood v. Yordy*, 753 F.3d 899, 904-905 (9th Cir. 2014) ("mere speculation that defendants acted out of retaliation is not sufficient" and specific evidence of retaliation is required to defeat summary judgment). Similarly, Romero was not aware of any race-related complaint that Mack had raised with

18

Fahnestock. Ex. 25 ¶ 8. Rather, Fahnestock told Romero only that Mack believed his performance was being watched more closely because of his current and prior PIPs and his repeated performance failures. Ex. 18, 111:5-17.

In an attempt to salvage his retaliation claim, Mack testified that he "made a reference to" race discrimination with Romero. Ex. 2, 214:19-215:24. However, he could not remember what he said, the substance of the comment, or when he made the comment. *Id*. Such a vague allegation is insufficient to overcome summary judgment when Romero has testified that Mack never raised the issue of race with him and none of the recording of conversations with Romero mention anything about race. Ex. 25 ¶ 9; Ex. 27. *See Anderson v. Academy Sch. Dist. 20*, 122 Fed. Appx. 912, 916 (10th Cir.2004) ("a vague reference to discrimination . . . without any indication that this misconduct was motivated by race . . . does not constitute protected activity and will not support a retaliation claim.")

### 3. There is no causal connection between the alleged protected activity and Mack's termination.

"Given the litany of reports about [Mack's] misconduct, [he] simply cannot satisfy a but-for standard of causation." *Brooks v. Capistrano Unified Sch. Dist.*, 1 F. Supp. 3d 1029, 1037 (C.D. Cal. 2014). Mack speculates that his Complaint in February 2018 set off a "domino effect" and department-wide conspiracy to have him terminated. Ex. 2, 218:10-17. However, Mack was counseled about his performance multiple times by Howard and Zane and was issued a PIP by Howard *before* he was ever assigned to Baca's team or made the Complaint. Ex. 9. Baca counseled Mack multiple times about his performance *before* February 2018. Ex. 8, American133-34; Ex. 12, American190; Ex. 11 ¶ 14. The only reason Mack complained about the training was because Baca came to him to discuss various performance issues that the trainers had raised. Ex. 11 ¶ 7. Thus, the indisputable evidence is that the alleged "domino effect" began long before Mack made the Complaint.[13]

---

[13] Notably, Mack did not complain about retaliation to anyone when Baca placed him on a PIP on March 30, 2018. To the extent Mack believed he was being retaliated against beginning in March 2018, he was required to file an administrative charge within 300 days. 42 U.S.C. § 2000e-5(e)(1); *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1192 (9th Cir. 2003). He did not do so, suggesting he did not believe he was being

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
Esplanade Center III, Suite 800
2415 East Camelback Road
Phoenix, AZ 85016
Telephone: 602.778.3700

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602.778.3700

Additionally, there is no temporal proximity between when Mack made the Complaint and when his employment was terminated. Mack was not discharged until over a year and a half after February 2018. "Where plaintiff relies on evidence of temporal proximity, the case law 'uniformly holds' that the temporal link 'must be very close.'" *Ellorin v. Applied Finishing, Inc.*, 96 F. Supp. 2d 1070, 1087 (W.D. Wash. 2014) (citation omitted). The temporal proximity here is too remote to infer causality. *See Breeden*, 532 U.S. at 273-74 (a three or four month gap is insufficient); *Wood v. GCC Bend, LLC*, 270 F. App'x 484, 486 (9th Cir. 2008) (five month gap defeats causal relationship); *Lawson v. Reynolds Indus. Inc.*, 264 F. App'x 546, 547 (9th Cir. 2008) (twelve-month gap is insufficient).

Further, the but-for standard precludes "an employee's preemptive engagement in a protected activity" from becoming "a shield against the imminent consequences of [terminable conduct]." *Drottz v. Park Electrochemical Corp.*, 2013 WL 6157858, at *15 (D. Ariz. Nov. 25, 2013); *see also Brooks v. City of San Mateo*, 229 F.3d 917, 917 (9th Cir. 2000) (complaints about discrimination should not be "tantamount to a 'get out of jail free card' for employees engaged in job misconduct"); *Saridakis v. United Airlines*, 24 F. App'x 813, 815 (9th Cir. 2001) (employee's termination following suspension, which occurred prior to EEOC charge, was a follow-up action to the suspension and was not retaliatory). That is exactly what happened here. Mack did not make the Complaint until he had already been counseled multiple times about his performance and was approached by Baca about his performance and attitude in training. He clearly used the Complaint as a shield against consequences of poor performance. Similarly, Mack claims he raised race discrimination with Nickel and Fahnestock only after he had been issued PIPs by different supervisors and feared losing his job. Such preemptive action aimed at preventing termination cannot form the basis of a retaliation claim.

//

//

discriminated against because of his race or retaliated against for submitting the Complaint.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
ESPLANADE CENTER III, SUITE 800
2415 EAST CAMELBACK ROAD
PHOENIX, AZ 85016
TELEPHONE: 602.778.3700

Even if Mack could prove a *prima facie* retaliation case, his claim still fails because, as discussed above, American had a legitimate, non-retaliatory reason for his termination that was not a pretext for retaliation.

**IV.     CONCLUSION**

The overwhelming evidence in this case proves that American terminated Mack because of his repeated, documented performance failures. There is no evidence that anyone at American discriminated against Mack because of his race or retaliated against him because of any protected activity. Therefore, American's Motion for Summary Judgment should be granted.

RESPECTFULLY SUBMITTED this 23rd day of September 2022.

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

By: /s/ Douglas (Trey) Lynn
Douglas (Trey) Lynn
2415 E. Camelback Road, Suite 800
Phoenix, AZ 85016

*Attorneys for Defendant*

21